McCormack, J.
(dissenting). I believe that the Court of Appeals correctly reversed defendant’s conviction and remanded for a new trial. I would therefore affirm its judgment, although I agree with the majority that the dispositive issue is whether defendant was subject to custodial interrogation, not the nature of the relationship between the questioner and defendant. While the nature of the relationship between the questioner and the defendant may inform the determination of whether custodial interrogation occurred, it is not the lynchpin of the analysis. However, because I conclude in this case that defendant was subject to custodial interrogation by the parole officer, I disagree with the majority that his statements to her were admissible at trial. Accordingly, I respectfully dissent.
*325 I. APPLICATION
Because the majority correctly sets forth much of the applicable law and determines that custodial interrogation is the decisive issue, I turn right to the case at hand: Did the circumstances surrounding parole officer Cheryl Evans’s questioning of defendant amount to custodial interrogation, making his statements inadmissible at his later trial for the robbery because the interrogation violated Miranda v Arizona[1] and Edwards v Arizona,[1]
[2] in light of defendant’s prior request for counsel? Unlike the majority, I conclude that the answer is yes.
A. DEFENDANT’S INITIAL ARREST AND INTERROGATION
Like the parties, the majority does not dispute that the initial police interrogation concerning the robbery for which defendant was convicted constituted custodial interrogation to which Miranda applies.[3] Nor can that conclusion be seriously questioned. Defendant was arrested and taken to jail, depriving him of his freedom of movement, and he was subjected to the precise “station house questioning” by police officers that was found to be inherently coercive in Miranda.[4] The officers were thus obligated to, and did, give defendant Miranda warnings. Because Miranda applied, defendant’s request for counsel triggered Edwards, and he could not *326 be subjected to further custodial interrogation about the robbery until counsel had been made available to him or he initiated communication. The detectives honored his request, stopped questioning him, and according to Smith, even told Evans that defendant had invoked his right to counsel before she interviewed him.
B. DEPENDANT WAS SUBJECT TO CUSTODIAL INTERROGATION WHEN EVANS QUESTIONED HIM
This leaves one issue: whether Evans’s questioning of defendant three days later violated Edwards. I disagree with the majority that Evans’s interview of defendant about the robbery can be viewed as noncustodial because custody, for purposes of Miranda and Edwards, was not broken between the initial interrogation by the police and Evans’s subsequent questioning three days later.
1. EDWARDS, NOT FIELDS, CONTROLS HERE
I conclude that Evans’s interview with defendant violated Edwards because the custodial environment established at the initial police interview never ceased, and defendant did not initiate this conversation. The United States Supreme Court in Maryland v Shatzer described the “paradigm Edwards case” as one in which “the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated.”[5] While defendant was technically arrested for violating his parole, the custodial interrogation that immediately followed his arrest indisputably involved the gas station robbery. Thus, that defendant was not initially arrested for the *327 robbery is of no moment. As in other paradigmatic Edwards cases described in Shatzer, defendant never “regained a sense of control or normalcy” after he was “initially taken into custody for the crime under investigation.”[6] In this case, just as in Edwards, defendant made the inculpatory statements at issue three days after his initial police interview, during which everyone agrees he invoked his right to counsel while confined to the local jail.[7]
These facts stand in stark contrast to those of the defendants in Shatzer and Fields, who were both serving sentences for unrelated crimes and living in the prison in which they were interviewed. In those cases, the defendants were interviewed in their “accustomed surroundings,” and when returned to the general prison population they simply resumed their “daily routine.”[8] In this case, defendant did not live at the Jackson County Jail. The majority asserts that defendant “could not be considered anything other than a ‘prisoner,’ as were the defendants in Fields and Shatzer.”[9] That argument is untenable given the similarities between this case and the paradigmatic Edwards case and the significant differences between this case and Shatzer and Fields. Defendant had not been placed back into his “normal” correctional facility environment, although he might legally have been a “prisoner” due to his parole status.[10] However, and most *328 important, it is not in dispute that he was not placed in custody for Miranda purposes for violating parole, but rather so that the police could interrogate him about the robbery. In short, it is unclear the extent to which Shatzer and Fields apply outside the context of prison inmates incarcerated on an unrelated charge and interviewed somewhere within the correctional facility that serves as their day-to-day home. But it is clear to me that here Edwards, and not Fields, controls.
Further, the custodial environment established during the initial police interview was not broken merely because it was a parole officer rather than a police officer who later questioned defendant about the same subject. First, the relationship between the questioner and the offender is not decisive. Second, Evans questioned defendant about the very crime for which he was previously questioned by the police officers and had invoked his Fifth Amendment right to counsel. Accordingly, defendant’s prior assertion of his right to counsel was still in effect when Evans interviewed him in the jail library. Because he did not initiate that discussion, it was in violation of Edwards.
Some of the facts relied on by the majority to support its position, in fact, further illustrate why this case is governed by Edwards and not Fields. For example, the majority notes that, as in Fields, defendant here was not free to leave the jail library by himself and roam free. But the significance of that fact in Fields was to demonstrate that the defendant’s freedom of movement was curtailed all the time because he lived in a prison as a result of a prior conviction and sentence.[11] In other *329 words, being unable to roam free was the defendant’s normal life, which inherently made that restriction less coercive. By contrast, before his arrest and custodial interrogation by the police three days earlier, defendant’s freedom of movement was not restricted by daily incarceration. While the facts of Fields may be similar on this point, their legal significance is not.[12]
2. EVEN UNDER FIELDS, CUSTODIAL INTERROGATION OCCURRED
Even assuming that the majority is correct that defendant’s ongoing Miranda/Edwards status was irrelevant and the Fields framework is applicable here instead, and I firmly believe it is not, a comparison between the facts of this case and Fields demonstrates that defendant was subjected to custodial interrogation. As in Fields, defendant did not invite the interview with Evans or consent to it in advance and he was not advised that he was free to decline to speak with Evans. Unlike in Fields, however, defendant in this case was not told that he was free to leave. Notably, the Fields majority cited the fact that the defendant in that case was told he was free to leave as the “[m]ost important” factor in its determination that the defendant was not in custody.[13] The Court went to the trouble to repeat its emphasis on this factor as “especially” important at the *330 end of its opinion.[14] Thus, I disagree with the majority that this fact is neither controlling nor particularly compelling here.
The majority believes that defendant’s parolee status itself is relevant to the freedom of movement inquiry because it makes him more familiar with law enforcement and the type of environment in which he was interviewed. However, given that Miranda requires an analysis of whether “in light of ‘the objective circumstances of the interrogation,’ a ‘reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave,’ ”[15] defendant’s subjective beliefs about his freedom of movement are irrelevant. As the United States Supreme Court has held, “a suspect’s prior interrogation history with law enforcement has no role to play in the custody analysis because such experience could just as easily lead a reasonable person to feel free to walk away as to feel compelled to stay in place.”[16] I see no distinction between a defendant’s prior history with law enforcement *331 and his parolee status. A parolee is a parolee because of his or her prior history with law enforcement. That “inquiry turns too much on the suspect’s subjective state of mind and not enough on the ‘objective circumstances of the interrogation.’ ”[17]
Also in critical contrast to Fields, when defendant was questioned by Evans, he indisputably had asserted his Fifth Amendment right to counsel. Fields, who had been incarcerated for some time for some other unrelated offense and presumably had become acclimated with his incarceration, was not previously questioned about the subject of his interrogation, nor had he therefore previously asserted his Fifth Amendment right to counsel. Irrespective of the reason for defendant’s initial arrest, defendant here had been continually incarcerated during the three days after the police had questioned him and he had invoked his right to counsel. The effect of this difference is hard to underestimate.
Because a reasonable person faced with these objective circumstances would not have felt at liberty to terminate the interrogation and leave, the first part of *332 the Miranda inquiry is satisfied. I also conclude that Evans’s interview with defendant presented the “same inherently coercive pressures as the type of station house questioning at issue in Miranda”[18] even if it is considered as a discrete event distinct from defendant’s initial custodial interrogation. Defendant was summoned to the jail library and was given no indication that he could decline to attend or leave the interview at any time. He was interviewed about the basis for his parole violations by Evans, the person serving as his parole officer for purposes of their meeting and with whom defendant had a prior relationship.[19] Perhaps most importantly, defendant had already been advised that he had a right to counsel before answering questions about the robbery, had taken that invitation up and requested counsel, but had not yet been provided counsel when he found himself questioned again about the same subject. Finally, Evans plainly had “authority to affect the duration of his sentence,”[20] as she was present at the jail to serve parole violation charges on defendant that could undoubtedly affect the amount of time defendant spent incarcerated.[21] Under these cir *333 cumstances, the interview subjected defendant to inherently coercive pressures for purposes of Miranda. Accordingly, Evans’s interview with defendant constituted its own custodial interrogation even under the Fields framework on which the majority relies.
Estelle v Smith is also instructive in determining whether Evans’s interview with defendant constituted its own custodial interrogation.[22] In that case, a psychiatrist interviewed the defendant in jail to evaluate the defendant’s competency to stand trial. The United States Supreme Court held that the state could not introduce the defendant’s statements or the psychiatrist’s conclusions, which were based on those statements. The Court noted that “[t]he considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here.”[23] The Estelle Court further observed that the defendant was in custody when the examination was conducted, and noted that the fact that he was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, was *334 “immaterial.”[24] The crucial inquiry, rather, was the role the psychiatrist played at the defendant’s trial, which included testifying for the prosecution on the crucial issue of respondent’s future dangerousness. In providing that testimony, the Court ruled, “his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting.”[25]
It is not disputed that defendant was in physical custody when Evans conducted the interview, that his interrogation was related to the robbery, or that he had previously asserted his Fifth Amendment right to counsel when questioned by police about the same subject. The role Evans played at the time of the interview is “immaterial” per Estelle.[26] The significant issue about Evans’s role is the one she played at defendant’s trial when she was directly adversarial to defendant; she testified that he made statements admitting to the robbery at issue, which were presented as substantive evidence of defendant’s guilt, and the prosecution referred to her as “probably the most crucial” witness. Just like in Estelle, regardless of her previous role in collecting defendant’s statement in the first place, by providing such testimony, Evans’s “role changed and became essentially like that of an agent of the State” recounting statements obtained in violation of Edwards.[27]
II. WAIVER
The Chief Justice joins the majority’s result on the basis that defendant waived his Fifth Amendment right *335 to counsel by initiating further communication with the police. I respectfully disagree with his waiver argument for three reasons. First, I do not believe and I know of no authority to support, the proposition that Miranda can be circumvented by an ex post facto waiver analysis when defendant, having asserted his right to counsel, did not in fact initiate the subsequent conversation in which the incriminating statements were made.[28] It is undisputed that defendant did not initiate the interview with Evans. Second, the prosecution never made a waiver argument, in this Court or in the lower courts. Third, defendant’s alleged letter appears nowhere in the record and there is no evidence the police ever actually received it, so I would not rely solely on Evans’s testimony about defendant’s statement about sending a letter in order to find waiver here.
III. CONCLUSION
I respectfully dissent from the majority’s decision to reverse the judgment of the Court of Appeals. I would hold that the custodial environment established during defendant’s initial police interview as well as his invocation of his right to counsel remained in effect at the *336 time Evans interviewed him. Because defendant did not initiate the interview with Evans, the admission of Evans’s testimony regarding defendant’s statements to her violated Edwards. Alternatively, I would hold that Evans’s questioning of defendant constituted its own custodial interrogation for Miranda purposes. The Court of Appeals correctly concluded that defendant’s statements to Evans were inadmissible and should have been suppressed.[29] Accordingly, I would affirm the judgment of the Court of Appeals remanding this case for a new trial.
Cavanagh, J., concurred with McCormack, J.

 Miranda v Arizona, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

 Edwards v Arizona, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981).

 See People v Elliott, 295 Mich App 623, 633; 815 NW2d 575 (2012) (“[I]t is not disputed that defendant’s June 18, 2010, police interrogation constituted a custodial interrogation under Miranda.”).

 Howes v Fields, 565 US _, _; 132 S Ct 1181, 1190; 182 L Ed 2d 17 (2012).

 Maryland v Shatzer, 559 US 98, 106; 130 S Ct 1213; 175 L Ed 2d 1045 (2010).

 Id. at 107.

 See id. (describing the facts in Edwards).

 Id. at 113.

 Ante at 314.

 See ante at 314. The majority’s citation to the parole statutes for the proposition that all parolees are “prisoners” under Michigan law does not justify incorporation of that very broad understanding of “prisoner” into the Miranda context. State statutes do not control the application of federal constitutional principles.

 See Fields, 565 US at _; 132 S Ct at 1194 (“Returning to his cell would merely have returned him to his usual environment. . . . ‘Interrogated suspects who have previously been convicted of crime live in *329 prison. When they are released back into the general prison population, they return to their accustomed surroundings and daily routine — they regain the degree of control they had over their lives prior to the interrogation.’ ”), quoting Shatzer, 559 US at 113.

 This conclusion is further supported by the fact that in the typical Miranda analysis, the inability to leave the interview freely is considered a factor supporting a finding of custody for purposes of Miranda. See, e.g., JDB v North Carolina, _ US _, _; 131 S Ct 2394, 2411; 180 L Ed 2d 310 (2011).

 Fields, 565 US at _; 132 S Ct at 1193.

 Id. at _; 132 S Ct at 1194 (“Taking into account all of the circumstances of the questioning — including especially the undisputed fact that respondent was told that he was free to end the questioning and to return to his cell — we hold that respondent was not in custody within the meaning of Miranda.”).

 Fields, 565 US at _; 132 S Ct at 1189 (emphasis added; citation omitted; alteration in original).

 JDB, _ US at _; 131 S Ct at 2404 (“Because the effect in any given case would be ‘contingent [on the] psycholog[y]’ of the individual suspect, the Court explained, such experience cannot be considered without compromising the objective nature of the custody analysis.”), quoting Yarborough v Alvarado, 541 US 652, 668; 124 S Ct 2140; 158 L Ed 2d 938 (2004); see also Alvarado, 541 US at 666-667 (stating that “[o]ur opinions applying the Miranda custody test have not mentioned the suspect’s age, much less mandated its consideration. The only indications in the Court’s opinions relevant to a suspect’s experience with law enforcement have rejected reliance on such factors,” and that “[t]here is an important conceptual difference between the Miranda custody test *331 and the line of cases from other contexts considering age and experience. The Miranda custody inquiry is an objective test”) (emphasis added).

 Alvarado, 541 US at 669 (citation omitted). The majority supports its reliance on the relevance of defendant’s parolee status by citing to Fields and its discussion of whether the interrogator has “official power” over the defendant. See ante at 310 n 9. This is wrong for two reasons. First, that quote appears nowhere in the Fields discussion of the freedom-of-movement inquiry; rather, it is mentioned in the discussion of whether “imprisonment alone,” i.e., when the deprivation of freedom of movement is already established, is sufficient to create a custodial situation within the meaning oí Miranda. Second, the quotation only establishes that the questioner’s power over the defendant is relevant. It does not make relevant whether a reasonable parolee would know that his parole officer “has no control over the jail, its staff, or the individuals incarcerated there.”

 Fields, 565 US at _; 132 S Ct at 1190.

 The majority attaches great significance to the fact that Evans was not defendant’s regular parole officer. However, it is significant that Evans testified that she had supervised defendant in the past, that she “couldn’t even count the number of times” she had been in contact with him, and that she and defendant “have respect for each other for the way he’s dealt with us in the past and the way that I’ve dealt with him.” Thus, the majority’s assertion that no “unique relationship” existed between the two of them is, at the very least, open to debate. Moreover, that Evans was not defendant’s regular parole officer did not remove or dilute her power over him given that she was plainly a state actor responsible for overseeing his parole violation case at the time of the interview.

 Id. at _; 132 S Ct at 1191.

 Indeed, had defendant not been convicted of the armed robbery, the parole violations may have been dispositive of how much time defendant *333 served, and Evans’s influence would have been critical. Additionally, at the time of Evans’s interview, the parole violations had not been adjudicated; she was there to serve defendant with the violation charges. What penalty would result from the charges was still unknown to defendant during this interview.

 Estelle v Smith, 451 US 454; 101 S Ct 1866; 68 L Ed 2d 359 (1981). I articulate my argument in this manner because as explained in part 1(B)(1) of my opinion, my primary contention is that the custodial environment established at the initial police interview never ceased, so Edwards controls.

 Id. at 467. The majority contends that Estelle is irrelevant to the custody issue because the Court simply assumed the defendant in Estelle was in custody for Miranda purposes because he was in jail. I disagree. In fact, the Estelle Court analyzed whether the psychiatric examination involved a coercive environment. Thus, it is instructive with regard to the custody issue.

 Id.

 Id.

 This fact renders inapt the prosecution’s attempt to analogize the parole officer/parolee relationship generally to the social worker/client relationship.

 Id.

 See Miranda, 384 US at 479 (“[The defendant] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant].”) (emphasis added); see also Shatzer, 559 US at 111 n 7 (“Edwards establishes apresumption that a suspect’s waiver of Miranda rights is involuntary.”).

 Although the prosecution has not argued that the admission was harmless in this Court, I agree with the Court of Appeals that the admission of defendant’s statements to Evans was not harmless for the reasons stated in the Court of Appeals opinion.